**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *BRITTANI DANETTE ATKINS*, | ) |
|     Plaintiff, | ) |
| | ) |
| *v.* | ) |
| | ) |
| *HEALTHCARE REVENUE RECOVERY GROUP, L.L.C.*, | ) |
|     Defendant. | ) |

**PLAINTIFF BRITTANI ATKINS' RESPONSE TO
THE DEFENDANT'S MOTION TO DISMISS (ECF 45)**

Defendant HRRG's motion correctly states that "HRRG's motion raises a simple issue: does Plaintiff have standing to bring this action under the FDCPA?" (ECF 45, p. 2.) The simple answer is Yes, according to *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 463 (7th Cir. 2020), in which the Seventh Circuit held that just a "few unwanted … text messages can constitute a concrete injury-in-fact for Article III purposes." In *Gadelhak,* at 462, the court noted that "[t]he common law has long recognized actions at law against defendants who invaded the private solitude of another by committing the tort of 'intrusion upon seclusion.'" The court then held that, while a "few unwanted automated text messages may be too minor an annoyance to be actionable at common law[,] such texts nevertheless pose the same *kind* of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable." *Id*., at 463 (emphasis in original). The court then moved on to the case merits after the court had noted that the defendant "AT&T sent [plaintiff] Chicago resident Ali Gadelhak five text messages." *Id*., at 460 – 463. *See also*, *Lupia v. Medicredit, Inc*., 8 F.4th 1184, 1192 (10th Cir. 2021) (citing *Gadelhak* and holding that plaintiff had standing because the Defendant "made only one call to [Plaintiff] Ms. Lupia, that Ms. Lupia didn't answer").

While Ms. Atkins concedes that she does not have standing to prosecute her Count 1 and 2 claims, she does have standing to prosecute the Count 3 claim because, with respect to Count 3, the Defendant's "intrusion upon seclusion" was even greater than just five text messages. With respect to the Count 3 claim, Ms. Atkins alleges that the Defendant violated 15 U.S.C. § 1692d(5) because "the Defendant continued to place at least 5 more telephone calls to her," even after "she stated that she did not have any reason to speak with Defendant" when, "in March 2021, Ms. Atkins answered the Defendant's call." (ECF 1 (Complaint), p. 3, ¶¶ 11, 12, & 14.) In Ms. Atkins' responses to the Defendant's interrogatories, Ms. Atkins stated that, during this March 2021 call conversation, "Plaintiff conveyed to the Defendant that Plaintiff would not communicate further with the Defendant[1]." Ms. Atkins also testified that, during the March 2021 call, Ms. Atkins "told [the Defendant's representative to] just take [Ms. Atkins] off the database[, but the Defendant's representative] kept -- they kept calling[2]." Ms. Atkins additionally testified that "the [Defendant] company, kept calling [Ms. Atkins] after [Ms. Atkins] told them to take [her] out of the database[3]."

The Defendant's own production establishes that, after March 2021, the Defendant made 8 calls to Ms. Atkins, and Ms. Atkins has stated under oath that all of the Defendant's April 2021 calls interrupted her[4]. According to the Defendant's own production, the Defendant called Ms. Atkins on April 6, 2021 at 5:23pm, again on April 8, 2021 at 5:40pm, again on April 12, 2021 at 6:08pm, again on April 14 at 6:31pm, again on April 16 at 5:51, again on April 20 at 5:43pm, again on April 22 at 5:42pm, and again on April 27 at 5:37pm[5]. Ms. Atkins further testified that,

---

1 Attached Exhibit 1 (Excerpt of Ms. Atkins' Responses to Defendant's Interrogatories) (highlighting added to Exhibit).
2 Attached Exhibit 2 (Excerpt of Transcripts of Ms. Atkins' Deposition) (highlighting added to Exhibit).
3 Attached Exhibit 3 (Excerpt of Transcripts of Ms. Atkins' Deposition) (highlighting added to Exhibit).
4 Attached Exhibit 4 (Ms. Atkins' Affidavit).
5 Exhibit 5 (Defendant's Production of Discovery) (to be filed under seal pursuant to Court's

during the Defendant's April 27 call, Ms. Atkins answered "Hello," but the Defendant simply stated "bye" and disconnected the call[6]. Only after Ms. Atkins' counsel directly contacted the Defendant's President and cited the FDCPA, did the Defendant actually cease calling Ms. Atkins[7]. Thus, pursuant to *Gadelhak,* the Defendant's 8 unwanted calls constitute a concrete injury-in-fact for Article III purposes.

The Defendant finally asserts that "[a]ny supposed injury is not traceable to HRRG." (ECF 45, p. 11.) The Defendant's assertion is frivolous. The Defendant's intrusion on Ms. Atkins' seclusion was caused only by the Defendant and that intrusion on seclusion is traceable only, and directly, to HRRG.

Wherefore, Ms. Atkins respectfully urges the Court to hold that the simple answer is Yes, pursuant to *Gadelhak,* Ms. Atkins does have standing to bring this action. If the Court were to hold that Ms. Atkins has insufficiently pled her cause of action, she would respectfully move for leave to amend her complaint.

        Respectfully submitted,
        Plaintiff's, Britani Atkins's, Counsel
        North & Sedgwick, L.L.C.
by:   */s/ Paúl Camarena*
        Paúl Camarena, Esq.
        500 So. Clinton, No. 132
        Chicago, IL 60607
        paulcamarena@paulcamarena.com
        (312) 493-7494

---

    Confidentiality Order (ECF 24)).
6  Attached Exhibit 6 (Excerpt of Transcripts of Ms. Atkins' Deposition) (highlighting added to Exhibit).
7  Attached Exhibit 7 (Ms. Atkins' counsel's April 28, 2021 email to Defendant's President).

# Exhibit 1

**INTERROGATORY NO. 17**

Please provide the basis behind your allegation that HRRG had "knowledge" that it would not be able to communicate meaningfully with you after your first telephone conversation. *See* Complaint ¶14.

**RESPONSE:**

**Plaintiff conveyed to the Defendant that Plaintiff would not communicate further with the Defendant.**

**INTERROGATORY NO. 18**

Please identify the factual basis behind your allegation that HRRG placed a call to you on April 2021 and how you know HRRG was the caller in light of your allegation that the call was disconnected before anything was said. *See* Complaint, ¶ 15.

**RESPONSE:**

**Plaintiff called back and the Defendant identified itself.**

**INTERROGATORY NO. 19**

Please identify why the disconnected telephone call caused you to tremble and how this is an "injury-in-fact" caused by HRRG. *See* Complaint, ¶ 17.

**RESPONSE:**

**Plaintiff objects to responding on the basis that the interrogatory calls for a legal conclusion.**

**INTERROGATORY NO. 20**

With respect to the actual damages sought by you in this lawsuit: (a) specify all the damages you seek in this matter; (b) explain in detail how you calculated such damages; and (c) identify all documents which relate to such claim for damages.

# Exhibit 2

Page 58

1   A   I did not see any healthcare -- regarding
2  this situation or period?
3   Q   Regarding this situation.
4   A   No, I did not go and see any healthcare
5  providers regarding this situation.
6   Q   Okay.  Have you ever treated before for,
7  you know, any emotional distress?
8   A   No.
9   Q   Have you ever seen a therapist before?
10   A   No.
11   Q   Okay.  Or have you ever seen someone who
12  is similar to a therapist, like a counselor or
13  something like that?
14   A   I mean, in my entire life?
15   Q   Yes.
16   A   Or regarding this situation?
17   Q   In your entire life.
18   A   Yeah, in my entire life I've seen a
19  counselor, you know, like my regular, you know,
20  college counselors and, you know, people that you
21  can confide in, my pastor.
22   Q   Okay.
23   A   Like when you need to talk but not like
24  therapy, an emotional therapist.

Page 59

1   Q   Okay.  And I know -- I think you already
2  answered this question before, but after these
3  telephone calls did you talk to anybody about what
4  happened in terms of the allegations in your
5  complaint against Healthcare Revenue Recovery
6  Group?
7   A   Anyone outside of Attorney Paul?  No, I
8  did not.
9   Q   Okay.  In your own words, if you don't
10  mind, could you kind of tell us what you believe
11  Healthcare Revenue Recovery Group did wrong here?
12   A   For one, I told them I did not have any
13  business with them, take me off the database,
14  figured it had to be some type of database, it was
15  something that, you know, was wrong because I know
16  I didn't have any business with them.  So I told
17  them to take me off the database, I don't have any
18  business with them specifically.
19        She began to say that I do have
20  business with them.  She wouldn't tell me what
21  business it was unless I gave her my personal
22  information.  So then I told her just take me off
23  the database.  She kept -- they kept calling, I
24  don't want to keep saying "she" because I don't

Page 60

1  know if it was a she or he, they, the company, kept
2  calling me after I told them to take me out of the
3  database.  For two, they hung up on me when they
4  called instead of just talking.  I don't know.
5  That was weird.  Like there's no real reason to
6  hang up on me.
7        So those were the two major things
8  that went wrong here in my personal opinion because
9  if I tell you to stop calling, in my opinion and my
10  understanding of the law is you have to stop
11  calling me.  Whether you believe I have business
12  with you or I believe that I don't, if I
13  specifically say take me out of the database then
14  you should probably just take me out of the
15  database and just deal with it some other type of
16  way or something.  I don't know how they're
17  supposed to deal with it if I say don't call, but I
18  do feel like my understanding of the law is you
19  cannot call me once I say don't call me.
20   Q   Do you believe that Healthcare Revenue
21  Recovery Group was deceptive in any way?
22   A   I believe that they -- the original
23  deception came from them calling from Illinois and
24  they're in Florida.

Page 61

1   Q   Okay.
2   A   That's kind of deceiving, right?
3   Q   Do you have any reason to believe the
4  balance from Little Company of Mary was incorrect?
5   A   I don't have reason to believe that.  I
6  mean, it could be correct, it could not be correct.
7  I don't really believe that I -- I would not be
8  harassing me at this level for $27.
9        Yeah.  I -- like I said, I didn't know
10  the balance or anything.  Before I called her back
11  that time she would not give me any information, so
12  I had no idea what the balance was.  She's the one
13  who told me the balance.  I don't have any way of
14  knowing if it's correct or incorrect at this point.
15  I haven't even gotten into all of that with United
16  Healthcare or anything.  It's $27.
17        (Document was marked Exhibit 6
18         for identification.)
19  BY MS. EASOM:
20   Q   We're going to shift gears a little bit
21  and kind of just go over some of the disclosures
22  that your attorney has sent over our way in this
23  case.
24        So I'm going to share my screen again.

# Exhibit 3

Page 58

1  A   I did not see any healthcare -- regarding
2  this situation or period?
3  Q   Regarding this situation.
4  A   No, I did not go and see any healthcare
5  providers regarding this situation.
6  Q   Okay. Have you ever treated before for,
7  you know, any emotional distress?
8  A   No.
9  Q   Have you ever seen a therapist before?
10  A   No.
11  Q   Okay. Or have you ever seen someone who
12  is similar to a therapist, like a counselor or
13  something like that?
14  A   I mean, in my entire life?
15  Q   Yes.
16  A   Or regarding this situation?
17  Q   In your entire life.
18  A   Yeah, in my entire life I've seen a
19  counselor, you know, like my regular, you know,
20  college counselors and, you know, people that you
21  can confide in, my pastor.
22  Q   Okay.
23  A   Like when you need to talk but not like
24  therapy, an emotional therapist.

Page 59

1  Q   Okay. And I know -- I think you already
2  answered this question before, but after these
3  telephone calls did you talk to anybody about what
4  happened in terms of the allegations in your
5  complaint against Healthcare Revenue Recovery
6  Group?
7  A   Anyone outside of Attorney Paul? No, I
8  did not.
9  Q   Okay. In your own words, if you don't
10  mind, could you kind of tell us what you believe
11  Healthcare Revenue Recovery Group did wrong here?
12  A   For one, I told them I did not have any
13  business with them, take me off the database,
14  figured it had to be some type of database, it was
15  something that, you know, was wrong because I know
16  I didn't have any business with them. So I told
17  them to take me off the database, I don't have any
18  business with them specifically.
19      She began to say that I do have
20  business with them. She wouldn't tell me what
21  business it was unless I gave her my personal
22  information. So then I told her just take me off
23  the database. She kept -- they kept calling, I
24  don't want to keep saying "she" because I don't

Page 60

1  know if it was a she or he, they, the company, kept
2  calling me after I told them to take me out of the
3  database. For two, they hung up on me when they
4  called instead of just talking. I don't know.
5  That was weird. Like there's no real reason to
6  hang up on me.
7      So those were the two major things
8  that went wrong here in my personal opinion because
9  if I tell you to stop calling, in my opinion and my
10  understanding of the law is you have to stop
11  calling me. Whether you believe I have business
12  with you or I believe that I don't, if I
13  specifically say take me out of the database then
14  you should probably just take me out of the
15  database and just deal with it some other type of
16  way or something. I don't know how they're
17  supposed to deal with it if I say don't call, but I
18  do feel like my understanding of the law is you
19  cannot call me once I say don't call me.
20  Q   Do you believe that Healthcare Revenue
21  Recovery Group was deceptive in any way?
22  A   I believe that they -- the original
23  deception came from them calling from Illinois and
24  they're in Florida.

Page 61

1  Q   Okay.
2  A   That's kind of deceiving, right?
3  Q   Do you have any reason to believe the
4  balance from Little Company of Mary was incorrect?
5  A   I don't have reason to believe that. I
6  mean, it could be correct, it could not be correct.
7  I don't really believe that I -- I would not be
8  harassing me at this level for $27.
9      Yeah. I -- like I said, I didn't know
10  the balance or anything. Before I called her back
11  that time she would not give me any information, so
12  I had no idea what the balance was. She's the one
13  who told me the balance. I don't have any way of
14  knowing if it's correct or incorrect at this point.
15  I haven't even gotten into all of that with United
16  Healthcare or anything. It's $27.
17      (Document was marked Exhibit 6
18      for identification.)
19  BY MS. EASOM:
20  Q   We're going to shift gears a little bit
21  and kind of just go over some of the disclosures
22  that your attorney has sent over our way in this
23  case.
24      So I'm going to share my screen again.

16 (Pages 58 - 61)

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *BRITTANI DANETTE ATKINS*, | ) |
|     Plaintiff, | ) |
| | ) |
| *v.* | ) |
| | ) |
| *HEALTHCARE REVENUE RECOVERY GROUP, L.L.C.*, | ) |
|     Defendant. | ) |

## **BRITTANI ATKINS' AFFIDAVIT**

I, Brittani Atkins, being first sworn on oath, state as follows:

1) I am the Plaintiff in the instant matter.

2) The Defendant's March 31, 2021 call to me interrupted me.

3) The Defendant's April 6, 2021 call to me interrupted me.

4) The Defendant's April 8, 2021 call to me interrupted me.

5) The Defendant's April 12, 2021 call to me interrupted me.

6) The Defendant's April 14, 2021 call to me interrupted me.

7) The Defendant's April 16, 2021 call to me interrupted me.

8) The Defendant's April 20, 2021 call to me interrupted me.

9) The Defendant's April 22, 2021 call to me interrupted me.

10) The Defendant's April 27, 2021 call to me interrupted me.

FURTHER AFFIANT SAYETH NOT.


*/s/ Brittani Atkins* 06/10/22
Brittani Atkins

Page 30

1 name, even though she should have my full name
2 because she called me, I didn't call her, and she
3 asked me for like my address. I can't remember if
4 she asked me for the last four of my Social, but I
5 know for sure she asked me like my address and my
6 full name for the record. I wasn't going to give
7 her my address because I didn't even -- it's so
8 easy for somebody to call you and get your
9 information. I'm like, "No."
10    Q   Have you ever received a telephone call
11 from a creditor before?
12    A   Yeah. I've received a call from a
13 creditor before.
14    Q   Okay. And when was that approximately?
15    A   Oh, I don't know. I don't write this
16 stuff down.
17    Q   And do you remember that first telephone
18 call that you received from Healthcare Revenue
19 Recovery Group, was that to your personal phone or
20 your business phone?
21    A   Yes, that was to my personal phone,
22 773/402-9322.
23    Q   Okay. And do you remember, you know,
24 what you saw when you received the call? Was it a

Page 31

1 telephone number on your caller ID?
2    A   Yes, it was a telephone number in my
3 caller ID the first time. Well, every time.
4    Q   And when you receive phone calls from
5 numbers that aren't saved in your phone do you
6 typically answer those phone calls?
7    A   I do.
8    Q   Okay. Do you ever receive telephone
9 calls from out-of-state numbers?
10    A   I do.
11    Q   Okay. And do you typically answer those
12 phone calls as well?
13    A   Yes.
14    Q   Do you have people that you don't know
15 calling you because you have your Atkins Financial,
16 LLC, as part of your business?
17    A   Would they call my 773 phone number?
18 It's possible depending on who the reference was or
19 if they got my information on Facebook or a group
20 or something like that. It's possible. It's not
21 my listed number as the business number, but if
22 it's a reference of a reference of a friend or
23 something and they have my personal number it's
24 very possible that someone could call me on that

Page 32

1 number.
2    Q   And is part of your business getting
3 referrals from friends and people will reach out to
4 you because they -- from word of mouth they've
5 heard about your financial --
6    A   Yeah, it's very possible. Yeah.
7    Q   Okay. And do you have a Facebook page
8 for your business as well?
9    A   I have a LinkedIn and a Twitter.
10    Q   What's your Twitter handle?
11    A   Breeyahdoesit.
12    Q   I'm sorry. What was that?
13    A   B-r-e-e-y-a-h doesit, d-o-e-s-i-t.
14    Q   Now, after Healthcare Revenue Recovery
15 Group called you that first time did you block
16 their number?
17    A   I did not. I told them that I had no
18 business with them. I didn't know they were going
19 to keep calling me over and over, so I had no real
20 reason to block them at that time. They're not
21 even blocked to this day.
22    Q   Did you ever send Healthcare Revenue
23 Recovery Group any letters?
24    A   I did not.

Page 33

1    Q   Did you ever send them any e-mails?
2    A   No.
3    Q   And did you ever call Healthcare Revenue
4 Recovery Group?
5    A   I called them, yes. I called them once.
6    Q   Okay. And was that -- I just want to
7 make sure we're kind of going in chronological
8 order. After that first conversation when was the
9 next time that you spoke with Healthcare Revenue
10 Recovery Group over the phone?
11    A   The next time I spoke with them over the
12 phone I believe was April.
13    Q   And that was when you called them or did
14 they call you?
15    A   ==That was when they called me and hung up,==
16 ==and then I called them back.==
17    Q   Okay. Now ==when you answered the phone==
18 ==what did you hear== on the other end on that second
19 telephone conversation?
20    A   Silence.
21    Q   Okay.
22    A   ==And I'm saying, "Hello. Hello." And==
23 ==then I heard like -- like bye, hang-up.==
24    Q   And do you remember where you were when

# Exhibit 7

**From:** Paul Camarena <paulcamarena@paulcamarena.com>
**To:** david_friedlander@teamhealth.com <david_friedlander@teamhealth.com>
**Sent:** Wednesday, April 28, 2021, 10:57:54 PM CDT
**Subject:** 15 U.S.C. §§ 1692c(a)(2) & 1692c(a)

Please have Healthcare Revenue Recovery Group refrain from reaching out to my client:

Brittani Atkins
(773) 402-9322

Thank you,


*Paúl Camarena, C.P.A., Esq.*

*Admitted to practice law exclusively in NY and before federal courts*

*Illinois Registered Certified Public Accountant*

*500 So. Clinton, No. 132*

*Chicago, IL 60607*

*(312) 493-7494*